**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00074-(JMC)** |
| **v.** | : | |
| | : | |
| **RACHEL MYERS** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Rachel L. Myers to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

**I.    Introduction**

Defendant Rachel L. Myers is a 31-year-old bartender who participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Myers pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because Myers: posted on Facebook in December 2020 that she was "totally fine with a civil war at this point.  It's beyond time";

---

[1] The approximate loss suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

entered the Capitol building through the Senate Wing Door only nine minutes after it was breached; traveled through the Capitol to the Crypt, the Rotunda, and the hallway outside Speaker Nancy Pelosi's office suite, where she stood feet away from another rioter who kicked open a door to the Speaker's Conference Room; entered the Speaker's Conference Room where she remained for a few seconds; was inside the Capitol for a total of 14 minutes before exiting; in the days after the riot, posted to Facebook that "We will be storming the Capitol next week" and that January 6 was "one of the best days of my life"; spread false information on Facebook, posting "Girl I was there Wednesday and NO RIOT ever happened.  The media are absolute liars" and "The cops opened those doors for everyone to walk right into the Capitol"; and to date, she has not expressed remorse.

The Court must also consider that Myers's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Myers's crime support a sentence of 14 days' incarceration, 36 months' probation, 60 hours community service, and $500 restitution.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 44 (Statement of Offense), at 1-7.

### Defendant Myers's Role in the January 6, 2021 Attack on the Capitol

In the days leading up to January 6, 2021, Myers expressed her support on Facebook for a violent uprising, stating, "I am totally fine with a civil war," and saying "It's beyond time." (Figure 1.)



*Figure 1: Myers's Facebook conversation in which she espoused support for a "civil war."*

In the following December 30, 2020 text message conversation with Lawrence Stackhouse, one of the men Myers walked through the Capitol with,[2] Myers discussed potential violence against counter-protestors and Myers's plan to march with "PBs" (Proud Boys) on January 6, 2021:

| | |
|---|---|
| MYERS: | 1. I'm not scared of those little f*****s<br>And if I died it would be something I was so passionate for so whatever lol |
| STACKHOUSE: | You're not dying rach |
| | [texts omitted] |

---

[2] Stackhouse was charged in *United States v. Stackhouse*, 1:21-cr-00240-BAH. He pled guilty to one count of violating 40 U.S.C § 5104(e)(2)(G) and was sentenced to 36 months of probation with special conditions of 14 days' intermittent confinement to be served in two periods of seven days each.

| MYERS: | Those twerps love weapons |
| MYERS: | Cuz they can't fight |
| STACKHOUSE: | I'll give u a knife |
| STACKHOUSE: | [name redacted] mentioned lot of bear mace |
| MYERS: | Yeah I heard that too |
| | [texts omitted] |
| MYERS: | I'll be marching with the PBs so they stay away from me |

In the early morning hours of January 5, 2021, the day before the riot took place, Myers drove from Philadelphia to Washington D.C. with Stackhouse and another man, where they met Michael Gianos[3] and a group of other people. On January 6, after staying the night in a local hotel, Myers and Stackhouse attended then-President Trump's rally, then proceed to walk to the U.S. Capitol building with other members of the crowd.

At approximately 2:13 p.m., rioters first forced their way into the U.S. Capitol. The first rioter to enter the building, Michael Sparks, jumped through a broken window next to the Senate Wing Doors. (Figure 2.)



*Figure 2: Sparks entering the U.S. Capitol through a broken window near the Senate Wing Door at approximately 2:13 p.m.*

---

[3] Gianos was charged as co-defendant with Myers in this case and is awaiting trial.

Moments later, Myers walked through those doors and into the Capitol building, followed by Stackhouse and Gianos. They entered at 2:22 p.m.—only nine minutes after Sparks had jumped through the adjacent window. (Figure 3.) Myers walked past broken glass and other debris to get inside. Stackhouse wore a Proud Boys hoodie.



*Figure 3: Screenshot from Interior Surveillance Camera Footage showing Myers entering the Senate Wing Doors at 2:22 p.m.*

Once inside the Capitol, Myers travelled with a mass of rioters into the Crypt at the center of the Capitol building's first floor. She then proceeded with the crowd through the Crypt and up a staircase to the building's second floor, where she made her way to the Rotunda.

From the Rotunda, Myers proceeded to the hallways adjoining Speaker Nancy Pelosi's office suite. She stood just feet away while another rioter kicked open a door to the Speaker's Conference Room. (Figure 4.) Rioters streamed inside, including Myers. (Figure 5.) She stayed in the room for a few seconds, then returned to the hallway where she waited for Stackhouse to exit. (Figure 6.) He remained in the room for approximately 40 seconds before returning to the hallway. Once reunited, Stackhouse and Myers continued through the hallways outside the Speaker's suite. (Figures 7, 8.)



*Figure 4: Screenshot from Interior Surveillance Camera Footage showing another rioter kicking in the Speaker's Conference Room door. Myers stood in the hallway to the left, just feet away.*



*Figures 5, 6: Screenshots from Interior Surveillance Camera Footage showing Myers enter, then exit the Speaker's Conference Room.*



*Figures 7, 8: Screenshots from Interior Surveillance Camera Footage Showing Myers with Stackhouse in the hallways near Speaker Pelosi's suite.*

A few minutes later, Myers left the Speaker's suite hallways, leaving the same way she had entered. She proceeded back down the same staircase she had come up, returning to the Crypt and the first floor of the building before proceeding to a nearby exit. Ultimately, Myers left the Capitol building at 2:36 p.m. after having been inside for about 14 minutes.

Myers continued to discuss the Capitol riot after January 6. In these communications she both minimized her conduct by stating that she had been "set up," while simultaneously reveling in her deeds, saying, "Look at us getting our hopes up again. We will be storming the Capitol next week." Myers and Stackhouse exchanged the following text messages on January 7 and 8, 2021:

STACKHOUSE:               Hey. You good ?

| | |
|---|---|
| STACKHOUSE: | We are legit PIC [Partners in Crime[4]] |
| MYERS: | Just not thinking about any of it anymore |
| MYERS: | Don't tell anyone you were there. Just move forward and we will deal with whatever comes our way if it happens ! |
| STACKHOUSE: | omg stop buggin |
| MYERS: | I'm not lol |
| MYERS: | I just don't wanna talk about any of it anymore |
| STACKHOUSE: | TMZ already released pictures of who they want. We're good |
| | |
| | [texts omitted] |
| | |
| MYERS: | I know you wouldn't and i doubt it'll ever happen but if [redacted] ever tries to text you for info , tell him nothing. You know he's nosey and always wants to know things |
| STACKHOUSE: | Don't even gotta worry about that |
| MYERS: | [sends photograph of rioters breaching the Capitol] |
| STACKHOUSE: | U scared me. Tho ihit we were in it |
| MYERS: | Lamo no but look |
| MYERS: | The doors were literally opened |
| STACKHOUSE: | Let us right in |
| MYERS: | What a set up |
| STACKHOUSE: | Trump will be president |
| MYERS: | Larry!!!!! Lol |
| STACKHOUSE: | I'm not giving up |
| | |
| | [texts omitted] |
| | |
| STACKHOUSE: | I think this is what he was talking about in his speech |
| MYERS: | Look at us getting our hopes up again. We will be storming the Capitol next week |
| STACKHOUSE: | Delete that text lol. |

On January 8, 2021, Myers replied to a comment on a Facebook post, stating "yes they let them in because it was a set up and I watched it all happen. This was an absolute inside job." She also commented on another post, "Girl I was there Wednesday, and NO RIOT ever happened. The media are absolute liars. The cops opened those doors for everyone to walk right into the Capitol." On that same day, Myers messaged another Facebook user, saying, "Pence is a deep state traitor

---

[4]   *See* https://www.cyberdefinitions.com/definitions/PIC.html (retrieved 1/27/23).

!!!!" and asking, "Why would he set us up to come there . Tell us he was holding the line and only count legal votes then put out a tweet in the middle of Trumps speech that he can't change anything."

On January 15, 2021, Myers messaged another Facebook user and stated, "By the time I even made it to the Capitol there were already flash bombs being exploded from people"; "And there were just random guys that would come up to you and be like LETS GO!!!!! We're going in!!!! Grab that over there. Push them people over there"; "It was so strange." Myers then claimed, "It was him and 226 other antifa members who spread out and planned fhis (*sic*) attack," and "Makes sense when I look back at it all." Myers then stated that with respect to January 6, 2021, "It was one of the best days of my life."

*Defendant's Post-arrest Interview with the FBI*

On December 10, 2021, Myers gave a post-arrest interview to the FBI. She admitted that she drove to Washington D.C. with Stackhouse to watch what was likely to be President Trump's last speech, and that they later met Gianos while there.

During the interview, Myers did not express remorse for her actions on January 6 and minimized her role in the riot. She claimed not to have seen any barricades or any altercations between the crowd and police. She said she heard the crowd repeatedly shout, "this is our house, you are allowed in there." Myers claimed to have been "stuck" in the crowd when she entered the Capitol building with Stackhouse, a claim that is belied by the CCTV video. (*See* Figure 3.) She said that, while in the Capitol building, she wanted to "get out," as it was too crowded inside and she could barely move, and claimed to have stayed inside for only a few minutes.

*The Charges and Plea Agreement*

On November 22, 2021, the United States charged Myers by criminal complaint with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On December 1, 2021, law enforcement officers arrested her in Pennsylvania. On March 8, 2022, the United States charged Myers by a four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On November 15, 2022, pursuant to a plea agreement, Myers pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G).

*Other Consideration*

Additional information may be found in the supplemental memorandum filed contemporaneously with this memorandum and filed under seal.

### III.    Statutory Penalties

Myers now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, she faces up to six months of imprisonment and a fine of up to $5,000. She must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a "grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Myers's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Myers, the absence of violent or destructive acts is not a mitigating factor. Had Myers engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Myers's case is her entry into one of the most sensitive areas of the Capitol building, Speaker Nancy Pelosi's office suite. She stood merely feet away from a fellow rioter when he kicked in the door to the Speaker's Conference Room—then Myers followed him inside. Although she stayed in the room for several seconds, then left to wait in the hallway, her foray into the private confines of the person who was third-in-line to the Presidency should not be ignored.  Moreover, while Myers was in the Speaker's office suite and Conference

Room, Speaker Pelosi's staffers were at that moment hiding under a table, in the dark, behind a barricaded door a short distance away, in fear of the rioters.[5]

The Court should also consider Myers's lack of remorse since January 6. In private conversations and in her interview with the FBI, Myers repeatedly attempted to minimize her conduct. She claimed to have been "set up," said she was "stuck" in the crowd, and blamed Mike Pence for being a "deep state traitor." At the same time, she claimed that January 6 was "one of the best days of [her] life" and said she hoped to be "storming the Capitol next week."

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Myers

As set forth in the PSR, Myers's criminal history consists of a misdemeanor conviction in 2015 for Driving Under the Influence – Highest Rate of Alcohol (BAC .16+), for which she was sentenced to 90 days to 1 year of imprisonment. ECF 51 ¶ 26.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the

---

[5]      *See*      https://www.washingtonpost.com/nation/2021/01/11/pelosi-60-minutes-capitol-impeachment/ ("As a pro-Trump mob beat down the door to House Speaker Nancy Pelosi's office on Wednesday, her staff ran into a conference room, barricaded the door, switched off the lights and cowered under a long table. Eight of them stayed there for 2½ hours as rioters pounded on the door and ransacked and defaced the speaker's office, Pelosi told "60 Minutes" on Sunday.") (retrieved 1/27/23).

presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process— that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Myers's words and conduct before, during, and after January 6 demonstrate the need for specific deterrence in this case. Before the riot she said she was "totally fine with civil war at this

point.  It's beyond time", and afterwards she wrote that "We will be storming the Capitol next week" and that January 6 was "one of the best days of my life." Myers has not shown remorse for her actions. In her FBI interview, she minimized her role and did not exhibit contrition.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Myers based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Myers has pleaded guilty to Count Four of the Information, charging her with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C.

---

[6] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

§ 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several

factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24

("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For instance, in *United States v. Lawrence Stackhouse*, 1:21-cr-00240-BAH, Chief Judge Howell sentenced Stackhouse, who accompanied Myers to Washington D.C. and was with Myers during much of her journey through the Capitol building, to 36 months of probation with special conditions of 14 days intermittent confinement. Stackhouse associated with the Proud Boys extremist group in the days before January 6. He tried to join the Philadelphia chapter of the Proud Boys by soliciting guidance on the application process from Gianos, another individual with whom Myers associated on January 6, then wore a Proud Boys hoodie while in the Capitol building. Stackhouse also took a route through the Capitol building substantially similar to that of Myers, entering through the Senate Wing Doors at the same time and travelling to the Speaker's office

suite. There are differences between Myers and Stackhouse however, including the fact that Stackhouse walked through a kicked-in door into the Speaker of the House's office and stayed in the room for nearly a minute, while Myers spent only a few seconds inside.

*United States v. Andrew Galloway,* 22-cr-12 (CRC), is another comparable case. There, the defendant breached the U.S. Capitol through a broken window near the Senate Wing Doors within approximately 11 minutes of the initial breach; travelled to the Crypt before exiting the Capitol, after spending approximately 10 minutes inside; made false self-exonerating statements to FBI agents about his participation in the riot; and loudly and publicly expressed his support for the riot shortly after leaving the Capitol building. When interviewed by the FBI, he denied having entered the Capitol, and did not express remorse. A search of Galloway's phone showed that even after January 6, Galloway actively followed communications from the Proud Boys. Unlike Myers's case, the government did not file any separate memorandum discussing mitigating factors. Judge Cooper sentenced Galloway to 30 days' incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[7]

## V.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence the defendant to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such

---

[7] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case); see generally Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(1), which authorize limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

           Respectfully submitted,

           MATTHEW M. GRAVES
           United States Attorney
           D.C. Bar No. 481052

By:    */s/ Eric Boylan*
           ERIC W. BOYLAN
           Assistant United States Attorney
           Texas Bar No. 24105519
           601 D Street N.W.
           Washington, DC  20002
           Tel:  (202) 815-8608
           Email: eric.boylan@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 2nd day of February 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>/s/ *Eric Boylan*</u>
Eric W. Boylan
Assistant United States Attorney